UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | |
|---|---|
| KATHY LITTLE; GREG WALKER and DEBRA L. WALKER, husband and wife; RICHARD EVANS; and PHILLIP WHITAKER and FAYE WHITAKER, husband and wife; on behalf of themselves and all others similarly situated, | C.A. No.  3:13-CV-1214-JHM |
| | CLASS ACTION COMPLAINT |
| Plaintiffs, | |
| | Jury Trial Demanded |
| v. | |
| LOUISVILLE GAS AND ELECTRIC COMPANY and PPL CORPORATION, | |
| Defendants. | |

010329-11  661448 V1

## TABLE CONTENTS

**Page**

I.     INTRODUCTION ............................................................................................1

II.    JURISDICTION AND VENUE ....................................................................5

III.   PARTIES ........................................................................................................6

IV.    FACTUAL ALLEGATIONS APPLICABLE TO THE CLASS.......................7

    A.     The Cane Run Site and its Coal Waste Emissions....................................7

    B.     The Cane Run Site's Documented Emissions into the Surrounding Areas...........14

        1.     Evidence of Cane Run Site's Emissions Collected by Residents..............15

        2.     The APCD's Notices of Violation ..............................................18

        3.     The APCD's Dust Investigation ................................................22

        4.     LG&E's Documentation of Its Own Emissions.........................23

    C.     Coal Dust, Coal Ash, and Other Coal Combustion Byproducts Settle Both Outside and Inside Neighbors' Homes within a Five-Kilometer Radius of the Cane Run Site in Significant Quantities ..........................24

    D.     Health Risks of the Particles Emitted by the Cane Run Site .................25

V.     FACTS PERTAINING TO THE NAMED PLAINTIFFS ...............................27

    A.     Kathy Little ...........................................................................27

    B.     Greg and Debra Walker ........................................................29

    C.     Richard Evans .......................................................................31

    D.     Phillip and Faye Whitaker ....................................................33

VI.    CLASS ACTION ALLEGATIONS ................................................................35

VII.   DAMAGES SOUGHT BY THE CLASS........................................................38

VIII.  SERVICE OF NOTICE OF INTENT TO SUE  PURSUANT TO RCRA AND THE CAA........................................................................................40

IX.    CAUSES OF ACTION ...................................................................................40

- i -

COUNT I: (VIOLATION OF RCRA, 42 U.S.C. § 6972(A)(1)(A)), AGAINST ALL DEFENDANTS ..................................................................................................40

COUNT II: (VIOLATION OF RCRA, 42 U.S.C. § 6972(A)(1)(B)), AGAINST ALL DEFENDANTS ..................................................................................................43

COUNT III: (VIOLATION OF THE CAA, 42 U.S.C. § 7604(A)(1)), AGAINST ALL DEFENDANTS ..................................................................................................46

COUNT IV: (PERMANENT NUISANCE) AGAINST DEFENDANT LG&E..........................52

COUNT V: (TEMPORARY NUISANCE) AGAINST DEFENDANT LG&E...........................53

COUNT VI: (TRESPASS) AGAINST DEFENDANT LG&E ................................................54

COUNT VII: (NEGLIGENCE *PER SE*) AGAINST DEFENDANT LG&E..............................55

COUNT VIII: (NEGLIGENCE) AGAINST DEFENDANT LG&E ..........................................56

COUNT IX: (GROSS NEGLIGENCE; WILLFUL OR WANTON MISCONDUCT) AGAINST DEFENDANT LG&E ..................................................................................56

X.      PRAYER FOR RELIEF .................................................................................................58

XI.     JURY DEMAND ..........................................................................................................59

010329-11  661448 V1

Plaintiffs Kathy Little, Greg Walker, Debra Walker, Richard Evans, Phillip Whitaker, and Faye Whitaker, individually and on behalf of all others similarly situated, bring this class action against Defendants, seeking monetary damages, injunctive and other relief to address Defendants' long-standing and continuing emission of coal dust, coal ash, and other coal combustion byproducts that have contaminated and continue to contaminate their respective properties.

## I. INTRODUCTION

1. Both the law and common decency dictate that property owners may not dump waste on their neighbors' property. This is no less true for corporations, utilities, and businesses. Just as individuals cannot dump their household garbage on their neighbors' lawns, electric companies cannot allow their coal dust and coal ash to be blown onto their neighbors' homes and properties. The responsibility to avoid inundating neighbors with waste material is ever more pronounced when the waste is coal dust and coal ash that are harmful to breathe and which contain arsenic, chromium, lead, and silica that can cause serious illness. A company must be vigilant to take all reasonable steps to avoid releasing toxic pollutants on its neighbors.

2. This case arises from the continual breach of the basic standards expected of any property owner with residential neighbors. Defendants Louisville Gas and Electric Company ("LG&E") and PPL Corporation (collectively the "Cane Run Defendants" or "Defendants") operate a coal-fired power plant on a property commonly referred to in whole as the "LG&E Cane Run Power Plant" or "LG&E Cane Run Station" (hereafter the "Cane Run Site").

3. The Cane Run Site is bordered by the Ohio River to the west, and sits adjacent to residential areas on the Kentucky side of the river to the north, east, and south.

4. The coal-fired power plant on the Cane Run Site burns coal to fuel commercial boilers. The coal burning process does not entirely consume the coal. Instead, coal combustion

byproducts made up primarily of fly ash and bottom ash, remain.  These byproducts contain significant quantities of toxic materials including arsenic, chromium, and lead – all of which have been identified as carcinogenic.  They also contain silica, inhalation of which can cause silicosis.

5.       The Cane Run Site generates huge revenues.  In 2012 alone, Defendant LG&E reported gross revenues of $1.324 billion, a significant portion of which was derived from activities on the Cane Run Site.  Nevertheless, since at least 2008, the Cane Run Defendants have failed to make the necessary outlays to safeguard their waste.  They have instead allowed dangerous coal dust and coal ash to regularly escape the Cane Run Site and to continually coat its neighbors' homes and lawns with an unsightly and dangerous film of coal dust and coal ash.

6.       The coal ash consists of fly ash, bottom ash, and other coal combustion byproducts that include, but are not limited to, lime, calcium compounds, synthetic gypsum, wet scrubber ash, flue gas desulfurization ash, and flue gas desulfurization sludge.

7.       The coal dust, fly ash, bottom ash, and other coal combustion byproducts escape the Cane Run Site from multiple sources including:

> (a)    From a "Coal Storage Pile" where unburned, pulverized coal sits outside and uncovered.  This pile regularly emits coal dust into the air that travels off of the Cane Run Site;

> (b)    Through the emission stacks during the coal burning process.  Each year, these stacks release thousands of tons of coal ash into the air and off of the Cane Run Site;

> (c)    From a Sludge Processing Plant ("Sludge Plant") in which the Defendants treat some of their coal waste.  The Sludge Plant has

repeatedly ejected coal ash hundreds of feet into the air and off of the Cane Run Site; and

(d)     From a massive landfill of coal ash ("Coal Ash Landfill") that rises more than one hundred feet and is roughly 160 acres, an Ash Treatment Basin, and as many as four Ash Ponds, into which the Cane Run Defendants pile coal ash after burning.  Wind regularly blows coal ash off of these waste storage locations and off the Cane Run Site.

8.      As discussed in Section IV below, the Cane Run Defendants have not instituted or maintained adequate controls to insure that the coal dust, fly ash, bottom ash, and other coal combustion byproducts do not blow out of the emission stacks, out of the Sludge Plant, off of the Site's storage locations, and onto surrounding areas.

9.      Since 2011, the Louisville Air Pollution Control District ("APCD"), the Jefferson County agency charged with enforcing the District's environmental regulations, has issued Cane Run Defendant LG&E no fewer than six Notices of Violation.  These Notices of Violation, which are described in Section IV.B.2, and attached as Exhibits hereto, found that emissions of coal dust and coal ash (including fly ash and lime) from the Cane Run Site occurred on dozens of dates in 2011, 2012, and 2013.  The Notices of Violation also found that LG&E was still not in compliance with most of the regulations cited in the Notices at the time they were issued.

10.     As a result of the Cane Run Defendants' activities, and their failure to properly store and dispose of their coal and coal ash, local residents are repeatedly subjected to incidents such as the one depicted in this photograph, in which a cloud of coal ash was ejected from the Sludge Plant and travelled through the surrounding neighborhoods[1]:

---

[1] Photo attached to November 3, 2011 APCD Notice of Violation, *see* Section IV.B.2, *infra* (taken by Greg Walker on July 30, 2011).



11.    The coal dust, fly ash, bottom ash, and other coal combustion byproducts released by the Cane Run Site are visible in the air and, ultimately, as residue and dust on the exteriors of local homes, buildings, vehicles, lawns, gardens, patios, pools, and recreational items.

12.    The coal dust, fly ash, bottom ash, and other coal combustion byproducts have also migrated inside surrounding homes and buildings, where they coat interior living and working spaces and permeate the drywall, other structural elements, and HVAC systems.

13.    Coal dust, fly ash, bottom ash, and other coal combustion byproducts emitted by the Cane Run Site travel up to 10 miles, depending on wind patterns, to settle on residential properties in significant quantities.  The area within four miles of the Cane Run Site is

continually exposed to coal dust, fly ash, bottom ash, and other coal combustion byproducts in quantities that are both visible and that pose significant danger to human health.  Thousands of people live within four miles of the Cane Run Site.

14.      The fly ash, bottom ash, and other coal combustion byproducts that are generated, handled, stored, transported, and disposed of at the Cane Run Site, are regulated solid wastes, pursuant to the federal Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972. *See* 40 C.F.R. § 261.4(b)(4).  Toxic metals, including arsenic, chromium, and lead, which are constituents of the fly ash and bottom ash at the Cane Run Site, are toxic contaminants which can mandate that a waste be deemed hazardous under RCRA.  *See* 40 C.F.R. § 261.24.

15.      Defendants' activities constitute violations of RCRA, 42 U.S.C. § 6972, and the federal Clean Air Act ("CAA"), 42 U.S.C. § 7604.  The coal dust, fly ash, bottom ash and other coal combustion byproducts released by the Cane Run Site are both hazardous to human health and a noxious nuisance which has trespassed on and interfered with the Plaintiffs' and Class members' peaceful enjoyment of their properties and has damaged Plaintiffs' and Class members' properties in violation of Kentucky law.

16.      Plaintiffs, on behalf of themselves and the Class (herein defined), seek rulings that the Cane Run Defendants have violated federal and Kentucky law so as to entitle Plaintiffs and members of the class to monetary damages (both actual and statutory), injunctive relief, attorneys' fees and costs, and such other relief as the Court deems just.

## II.      JURISDICTION AND VENUE

17.      Plaintiffs bring this action pursuant to RCRA, 42 U.S.C. § 6972, and the CAA, 42 U.S.C. § 7604, which confer jurisdiction upon this Court over Plaintiffs' claims.  Supplemental jurisdiction over the state law claims exists pursuant to 28 U.S.C. § 1367.

18.     On September 6, 2013, Plaintiffs sent a Notice of Intent to Sue ("Notice") pursuant to RCRA, 42 U.S.C. § 6972(b)(1)(A) and 42 U.S.C. § 6972(b)(2)(A), and the CAA, 42 U.S.C. §7604(b)(1)(A), to the Cane Run Defendants.  A copy of this Notice is attached as Ex. 1.

19.     The Notice was also sent to the Administrator and Regional Administrator of the EPA, the Attorney General of the United States, the Commissioner of the Kentucky Department for Environmental Protection, the Director of the Kentucky Department for Environmental Protection's Division of Waste Management, and the Director of the APCD.

20.     Venue is proper in this District pursuant to RCRA, 42 U.S.C. §6972(a); the CAA, 42 U.S.C. § 7604(c)(1); and 28 U.S.C. § 1391(b), in that a substantial part of the events giving rise to Plaintiffs' claims occurred in this District and the Defendants are subject to personal jurisdiction in this District.

### III.     PARTIES

21.     Individual and representative Plaintiff Kathy Little is a resident of Kentucky. Mrs. Little owns and resides in her home located less than four miles from the Cane Run Site.

22.     Individual and representative Plaintiffs Greg and Debra Walker are residents of Kentucky.  Mr. and Mrs. Walker own and reside in their home located less than four miles from the Cane Run Site.

23.     Individual and representative Plaintiff Richard Evans is a resident of Kentucky. Mr. Evans owns and resides in his home located less than four miles from the Cane Run Site.

24.     Individual and representative Plaintiffs Phillip and Faye Whitaker are residents of Kentucky.  Mr. and Mrs. Whitaker own and reside in their home located less than four miles from the Cane Run Site.

25.     Defendant PPL Corporation ("PPL") is a corporation organized and existing under the laws of Pennsylvania, with its principal place of business located in Allentown,

Pennsylvania.  Upon information and belief, PPL is an energy and utility holding company.  PPL Corporation is the corporate parent of LG&E.  Further, upon information and belief, PPL Corporation acquired, and is therefore the successor-in-interest to, E.ON U.S. LLC, and E.ON U.S. Services Inc., the former corporate parents of LG&E.

26.     Defendant Louisville Gas and Electric Company ("LG&E") is a corporation organized and existing under the laws of Kentucky, with its principal place of business located in Louisville, Kentucky.  LG&E is a regulated utility and, upon information and belief, is a wholly-owned subsidiary of LKE and an indirect subsidiary of PPL.  PPL holds out LG&E as being a part of the "PPL family of companies."[2]  Upon information and belief, LG&E was a wholly-owned subsidiary of E.ON U.S. LLC prior to PPL acquiring E.ON U.S. LLC.  LG&E and KU Energy LLC ("LKE") is a limited liability company organized and existing under the laws of Kentucky, with its principal place of business located in Louisville, Kentucky.  Upon information and belief, LKE is a wholly-owned subsidiary of PPL, functions as an intermediary holding company, and shares common officers and directors with Defendant LG&E.

## IV.     FACTUAL ALLEGATIONS APPLICABLE TO THE CLASS

### A.     The Cane Run Site and its Coal Waste Emissions

27.     The coal-fired power plant on the Cane Run Site is operated by Defendant LG&E. The plant burns bituminous coal, also known as black coal, which is one of the three primary types of coal burned in power plants, the others being lignite and anthracite.

28.     Due to its high sulfur content, bituminous coal produces high quantities of sulfur oxide and nitrogen oxide gases, which can react with atmospheric moisture to produce acid rain (rain containing sulfuric acid).

---

[2] *See* http://www.pplweb.com/about-us/ppl-family-of-companies.aspx.

29.     Coal is transported to the Cane Run Site primarily by rail.  The unburned coal is pulverized and then stored outdoors on the Cane Run Site in a large "Coal Storage Pile," before the coal is to be burned in one of the plant's boilers.

30.     The Coal Storage Pile sits uncovered and regularly emits coal dust into the air that travels off of the Cane Run Site and into surrounding neighborhoods.

31.     The Cane Run Site uses three active boilers that are fueled by coal from the Coal Storage Pile to produce steam and, in turn, power generators that produce electricity.

32.     The coal burning process at the Cane Run Site does not entirely consume the coal which is burned in the boilers.  Instead, coal combustion byproducts remain.  Some of these byproducts are gases, such as sulfur and nitrogen oxides, and others are solid particulates.  The byproducts are, at least in part, intended to be captured by various technologies (described below).  However, significant quantities of both gas and solid particulates are released from the three emission stacks ("Stacks") attached to the boilers.  As a result, the smoke from these Stacks is often brown or black in color, as opposed to white.

33.     The primary solid coal combustion byproducts are fly ash and bottom ash.  Fly ash is a fine, powdery material.  Fly ash generally consists of silt-sized and clay-sized glassy spheres and has a consistency similar to talcum powder.[3]

34.     Bottom ash consists of agglomerated ash particles and typically has a porous surface structure.  Bottom ash is coarse, with angular grain sizes spanning from fine sand to fine gravel.[4]

35.     Fly ash, bottom ash, and other coal combustion byproducts[5] are intended to be captured in multiple ways at the Cane Run Site, including by:  (1) electrostatic precipitators in

---

[3] http://www.epa.gov/osw/conserve/imr/ccps/flyash.htm .

[4] http://www.epa.gov/osw/conserve/imr/ccps/bottomash.htm .

the Stacks which emit an electrical charge that binds the particles; (2) scrubber systems, including flue gas desulfurization, in the Stacks which absorb particles and gases which would otherwise escape.

36.     Despite these capture methods, hundreds of tons of coal combustion byproducts escape from the Stacks each year, and are emitted into the air and off of the Cane Run Site to settle on neighboring properties.  Examples of video footage of byproducts escaping from the Stacks and visible as black or brown smoke (as opposed to properly filtered white smoke) can be viewed at:

- http://www.youtube.com/watch?v=6LTFb3scY0M&feature=youtu.be

- http://www.youtube.com/watch?v=3xGf2Xb31Lw&feature=youtu.be

37.     Much of the fly ash, bottom ash, and other coal combustion byproducts that are captured by the Cane Run Site's power plant during the coal combustion process are stored in the "Ash Silo," and then processed in the Sludge Plant.

38.     The purported purpose of the Sludge Plant is to mix fly ash, bottom ash, and other coal combustion byproducts with a cementing agent, such as Poz-o-tec, that is intended to bind the particulates and limit the particulates' ability to blow into the air.

39.     During its operation, the Sludge Plant has repeatedly blasted large quantities of fly ash, bottom ash, and other coal combustion byproducts hundreds of feet into the air and off of the Cane Run Site.  Examples of video footage taken by local residents of the Sludge Plant releasing coal ash and other coal combustion byproducts into the air can be viewed at:

- http://www.youtube.com/watch?v=picswnx6Tog&feature=share&list=TLuiYyYk1U6Fs

---

[5] Other coal combustion byproducts include, but are not limited to, lime, calcium compounds, synthetic gypsum, wet scrubber ash, flue gas desulfurization ash, and flue gas desulfurization sludge.

CLASS ACTION COMPLAINT                    - 9 -
010329-11  661448 V1

- http://youtu.be/picswnx6Tog

40.    This photograph shows the Ash Silo and Sludge Plant that are adjacent to the side of the Coal Ash Landfill, part of which spans the background.[6]



41.    Captured fly ash, bottom ash, and other coal combustion byproducts are also stored on the Cane Run Site in the Ash Treatment Basin and in the Ash Ponds.

42.    During the periods relevant to this action, the Coal Ash Landfill, the Ash Treatment Basin, and the Ash Ponds have not been sufficiently covered with erosion-preventing material or kept sufficiently moist.  This has resulted in coal dust, fly ash, bottom ash, and other coal combustion byproducts being maintained in a dry state.  These dry materials are easily and

---

[6] Tim Darst (Posted August 12, 2010 to http://blogs.courier-journal.com/timdarst/2010/08/12/3935/ ).

commonly blown off of the Cane Run Site in the form of dust and ash by normal weather patterns and have frequently and consistently coated surrounding neighborhoods.

43.   A decade ago, the Coal Ash Landfill was relatively small and contained.  Since then it has grown drastically as more and more ash is dumped on it.  In recent years it has become massive.  It now stretches more than a quarter mile along the Ohio River, over an area of roughly 160 acres.  It is approximately 500 feet wide and rises more than 100 feet high.

44.     The size of the Coal Ash Landfill, its largely uncovered state, and its vulnerability to releasing dust and ash into the wind are illustrated in the following photograph[7]:



45.     The concern with which the Cane Run Defendants view the toxicity of the Coal Ash Landfill is apparent in this photograph of a worker wearing a hazardous materials suit as he works around the Coal Ash Landfill and the Sludge Plant.[8]

---

[7] Photograph taken by Greg Walker (2013).



46.     The Poz-o-tec that the Cane Run Defendants sometimes add to the fly ash, bottom

ash, and other coal combustion byproducts before depositing them on the Coal Ash Landfill has

proven ineffective in preventing the ash and other coal combustion byproducts from blowing off

of the Coal Ash Landfill and off of the Cane Run Site.  The control methods the Cane Run

Defendants use with respect to the Ash Treatment Basin and Ash Ponds are also ineffective in

keeping coal ash and other coal combustion byproducts from blowing from these storage

locations and off of the Cane Run Site.  As a result, as illustrated by the video clips in paragraph

57 below, and by the following video, large clouds of ash and coal combustion byproducts are

emitted from the Coal Ash Landfill, Ash Treatment Basin, and Ash Ponds into the surrounding

neighborhoods:

---

[8] Photograph taken by Greg Walker (2012).

- http://www.youtube.com/watch?v=v9CoTLeBC7U

47.     Further, despite regulations requiring them to do so, Defendants have failed to keep the Coal Ash Landfill sufficiently covered with earth or other material, or to sufficiently wet the Coal Ash Landfill, so as to prevent the coal ash and other coal combustion byproducts from blowing off the Coal Ash Landfill and off of the Cane Run Site.

48.     These incidents have also been documented extensively by local regulatory authorities, as described in more detail in Section IV.B.2 below.

49.     Rather than effectively remedy the problems of coal dust, fly ash, bottom ash, and other coal combustion byproducts escaping their property, the Cane Run Defendants have responded to complaints and to notices of violations with a series of ad-hoc and ineffective half-measures.  One such measure is documented in the video below showing a "screen" the Cane Run Defendants erected in front of part of the Coal Ash Landfill purportedly to prevent coal ash and other coal combustion byproducts from blowing off of the Coal Ash Landfill.  As the video recordings linked below show, this measure was ineffective.

- http://www.youtube.com/watch?v=q-fX8JORSME&feature=youtu.be

- http://www.youtube.com/watch?v=oXUB54y6lxo&feature=youtu.be

50.     To date, the Cane Run Defendants have shown themselves unable or unwilling to institute measures that will effectively prevent coal dust, fly ash, bottom ash and other coal combustion byproducts from escaping their property and coating neighbors' homes and property.

**B.      The Cane Run Site's Documented Emissions into the Surrounding Areas**

51.     The frequent and continual releases of coal dust, fly ash, bottom ash, and other coal combustion byproducts are well documented by several sources, including (1) video and photographic evidence amassed by local residents; (2) notices of violation issued to LG&E by

governmental agencies; and (3) Defendant LG&E's own regulatory reporting to city, state, and federal authorities.

   **1.**  **Evidence of Cane Run Site's Emissions Collected by Residents**

  52.  Local residents have reported witnessing emissions of plumes of coal dust and coal ash emanating from the Cane Run Site as frequently as several times a week since at least 2008.

  53.  Local residents report repeatedly finding their homes, lawns, vehicles and personal property coated with coal dust and ash residue.  Residents further report that the coal dust and ash residue returns within days of cleaning, thus indicating that the deposit of coal dust and ash residue on their properties is effectively continual.

  54.  Local residents have reported and documented finding coal dust and ash residue both inside and outside their homes.

  55.  The following photographs show representative contamination of coal dust and ash contamination on the outside and inside of homes located within four miles of the Cane Run Site[9]:

---

[9] Photographs taken in 2013.





56.    Local residents – particularly those living within five kilometers of the Cane Run

Site – have reported experiencing eye irritation, difficulty breathing, shortness of breath, and skin

irritation that they believe to result from exposure to coal dust, coal ash, and other coal

combustion byproducts.

57.    Some local residents have documented their experiences with videos and

photographs of coal dust, coal ash, and other coal combustion byproducts releases from the Cane

Run Site.  Examples of video footage recorded by local residents are included in paragraphs 36,

39, 46 and 49 above.  Additional video footage can be viewed at:

- http://www.youtube.com/watch?v=7GjvHezQk8M&feature=youtu.be

- http://www.youtube.com/watch?v=jknYM3PZp8U&feature=youtu.be

- http://www.youtube.com/watch?v=M1cxFLbgL_o&feature=youtu.be

- http://www.youtube.com/watch?v=BPgQCYsErGY&feature=youtu.be

- http://www.youtube.com/watch?v=ze0LNF7MNyI&feature=youtu.be

### 2.    The APCD's Notices of Violation

58.    The Cane Run Site is located in Jefferson County, Kentucky.  The Louisville Air Pollution Control District ("APCD") is the Jefferson County agency charged with enforcing the District's environmental regulations, which are promulgated pursuant to Kentucky Revised Statutes, Chapter 77.  Many of the APCD environmental regulations have been adopted by the United States Environmental Protection Agency ("EPA"), pursuant to Kentucky's State Implementation Plan ("SIP") under the CAA.  Violations of the APCD regulations adopted as part of Kentucky's SIP are therefore violations of the CAA.[10]

59.    The APCD has repeatedly cited Defendant LG&E for violations of the District's environmental regulations relating to the Cane Run Site's release of fly ash and other coal-related particulates into the surrounding community, as well as failing to control the strong sulfur odors produced by the Cane Run Site's generation and storage of coal combustion byproducts.

60.    Despite the violations the APCD has found and reported, the Cane Run Defendants have failed to take the required remedial actions, thus demonstrating their disregard for applicable law and for the communities around the Cane Run Site.

61.    A summary of the  Defendant LG&E's repeated citations by the APCD is set forth in the following paragraphs.

---

[10] *See* 42 U.S.C. § 7604(a)(1); 42 U.S.C. § 7604(f)(4).

62.     On July 22, 2011, the APCD issued to Defendant LG&E a Notice of Violation Letter and Incident/Violation Report (collectively the "July 22, 2011 NOV").[11]  The July 22, 2011 NOV describes multiple violations of APCD environmental regulations by LG&E in December 2010, and in February and April of 2011.  The violations involved the repeated release of fly ash and other particulates into the atmosphere and off of the Cane Run Site.  The APCD confirmed, through laboratory testing, that these releases resulted in the deposition of fly ash on local homes.  Dust samples taken from a home, and tested by both the APCD and Defendant LG&E, showed significant concentrations of fly ash.  As a result of the violations described in the July 22, 2011 NOV, the APCD assessed a civil fine of $4,000 against Cane Run Defendant LG&E.  No compensation was offered to residents affected by the fly ash and other particulates LG&E was found to have emitted.

63.     On November 3, 2011, the APCD issued to Cane Run Defendant LG&E a Notice of Violation Letter and Incident/Violation Report (collectively the "November 3, 2011 NOV").[12]  The November 3, 2011 NOV describes multiple violations of APCD environmental regulations by LG&E in June, July, and August of 2011.  The violations involved the repeated release of fly ash and other particulates into the atmosphere and off of the Cane Run Site.  According to the November 3, 2011 NOV, the releases were emitted from the Cane Run Site's Sludge Plant.  The APCD confirmed that these releases resulted in the deposition of fly ash on at least one local home.  The November 3, 2011 NOV also attached photos of fly ash clouds leaving the Cane Run Site and blowing through surrounding neighborhoods.  As a result of the violations described in the November 3, 2011 NOV, the APCD assessed a civil fine of $26,000 against Cane Run Defendant LG&E.  With respect to two of the three violations set forth in the November 3, 2011

---

[11] A copy of the July 22, 2011 NOV is attached as hereto Exhibit 1-A.

[12] A copy of the November 3, 2011 NOV is attached hereto as Exhibit 1-B.

NOV, Cane Run Defendant LG&E was still in violation of the stated APCD regulations as of the issuance of the November 3, 2011 NOV.  No compensation was offered to residents affected by the fly ash and other particulates LG&E was found to have emitted.

64.      On July 9, 2012, the APCD issued to Cane Run Defendant LG&E another Notice of Violation Letter and multiple Incident/Violation Reports (collectively the "July 9, 2012 NOV").[13]  The July 9, 2012 NOV describes numerous violations of APCD environmental regulations from January through June of 2012, including the emission of hundreds of pounds of fly ash and other particulates from the Sludge Plant and the Coal Ash Landfill, which resulted in fly ash and other particulates being deposited on the residential neighborhoods surrounding the Cane Run Site.

65.      The July 9, 2012 NOV also describes repeated failures by Cane Run Defendant LG&E to control objectionable sulfur odors in the ambient air surrounding the Cane Run Site, which the APCD concluded were emanating from one of the Cane Run Site's coal ash ponds, among other sources on the Cane Run Site.  The July 9, 2012 NOV also found that Defendant LG&E had emitted fly ash from one of the Cane Run Site's Stacks into the atmosphere, in violation of APCD regulations.  As a result of the violations described in the June 9, 2012 NOV, the APCD assessed a civil fine of $22,000 against Cane Run Defendant LG&E.  Of nine total violations set forth in the June 9, 2012 NOV, LG&E was still in violation of seven of them at the time the June 9, 2012 NOV was issued.  No compensation was offered to residents affected by the fly ash and other particulates or the sulfur odors which LG&E was found to have emitted.

---

[13] A copy of the July 9, 2012 NOV is attached hereto as Exhibit 1-C.

66.     On October 27, 2012, the APCD issued a Notice of Violation Letter and Incident/Violation Report to Defendant LG&E (collectively the "October 27, 2012 NOV").[14] The October 27, 2012 NOV describes an incident on September 13, 2012, in which the Sludge Plant released fly ash and lime into the air and off the Cane Run Site for a period of seven minutes.  This incident constituted a violation of APCD Regulation 1.05.  As a result of the violation described in the October 27, 2012 NOV, the APCD assessed a civil fine of $10,000 against Cane Run Defendant LG&E.  As of the date the October 27, 2012 NOV was issued, Cane Run Defendant LG&E remained in continued violation of APCD Regulation 1.05.  No compensation was offered to residents affected by the fly ash and lime LG&E was found to have emitted.

67.     On June 5, 2013, the APCD issued a Notice of Violation Letter along with multiple Incident/Violation Reports to Cane Run Defendant LG&E (collectively the "June 5, 2013 NOV").[15]  The June 5, 2013 NOV describes multiple violations of APCD environmental regulations by Cane Run Defendant LG&E from February of 2012 to February of 2013.  The violations involved the repeated release of fly ash and other particulate matter into the atmosphere and off of the Cane Run Site.  According to the June 5, 2013 NOV, the releases were emitted from the Sludge Plant, the Ash Silo, the Coal Ash Landfill, access roads on the Cane Run Site, construction activity on the Cane Run Site, and trucks operated by the Cane Run Defendants.  In response to the repeated release of fly ash and other particulates from the Cane Run Site, the APCD collected samples of particulate matter from homes around the Cane Run Site and found high concentrations of fly ash in each of them.

---

[14] A copy of the October 27, 2012 NOV is attached hereto as Exhibit 1-D.

[15] A copy of the June 5, 2013 NOV is attached hereto as Exhibit 1-F.

68.     The June 5, 2013 NOV further states that ambient air samplers commissioned by Defendant LG&E also detected significant concentrations of fly ash in the air at locations outside the Cane Run Site.  As a result of the violations described in the June 5, 2013 NOV, the APCD assessed a civil fine of $5,000 against Defendant LG&E.  Defendant LG&E was still in violation of all three regulatory violations set forth in the June 5, 2013 NOV at the time the June 5, 2013 NOV was issued.  No compensation was offered to residents affected by the fly ash and other particulates LG&E was found to have emitted.

69.     On August 2, 2013, the APCD issued a Notice of Violation Letter and an Incident/Violation Report to Cane Run Defendant LG&E (collectively the "August 2, 2013 NOV").[16]  The August 2, 2013 NOV describes the APCD's investigation of more than 25 complaints from citizens regarding strong sulfur odors emanating from the Cane Run Site during the first two weeks of June 2013.  The APCD determined that these incidents constituted a violation of the APCD environmental regulations requiring the control of objectionable odors in the ambient air.  As a result of the violation described in the August 2, 2013 NOV, the APCD assessed a civil fine of $65,000 against Cane Run Defendant LG&E.  No compensation was offered to residents affected by odors LG&E was found to have emitted.

### 3.     The APCD's Dust Investigation

70.     On June 4, 2013, the APCD released a "Cane Run Residential Area Nuisance Dust Investigation and Analysis" ("APCD Dust Investigation").[17]  The APCD Dust Investigation sampled and tested particulate matter deposited on three homes ranging from 0.31 miles to 0.45 miles from the Cane Run Site.  The APCD Dust Investigation concluded that all three of these homes were experiencing significant fly ash deposition.  The APCD Dust Investigation further

---

[16] A copy of the August 2, 2013 NOV is attached hereto as Exhibit 1-G.

[17] A copy of the APCD Dust Investigation report is attached hereto as Exhibit 1-E.

stated that the "results of the sample analysis demonstrate that dust emissions continue to be deposited on neighboring properties. Although airborne dust can arise from a variety of sources, the sample analysis indicates that fly ash particles, consistent with Poz-o-tec reference samples, are coming from the LG&E Cane Run plant."[18]

### 4. LG&E's Documentation of Its Own Emissions

71.     Upon information and belief, in July of 2011, in response to complaints from residents of dust contaminating their properties, Defendants hired the RG Lee Group to test surface dust samples taken from the homes of three residents located across Cane Run Road from the Cane Run Site.

72.     Two of the three homes tested are owned by named plaintiffs in this action, Greg and Debra Walker, and Kathy Little.

73.     The RG Lee Group produced a dust study ("RG Lee Group Dust Study").[19]

74.     The RG Lee Group Dust Study concluded:  "In summary, the results of this initial investigation indicate that fly ash/bottom ash particles were significant on each sample."[20]

75.     In the July 22 Notice of Violation, the APCD stated that APCD representatives were given a presentation by the RJ Lee Group at which it informed the APCD that all of the samples contained significant amounts of fly ash and that the ash came from the Cane Run Site. *See* July 22, 2011 NOV, Ex. 1-A.

76.     Through both its excess emission reports to the APCD and its Toxic Release Inventory ("TRI") Reports to the EPA, Defendant LG&E has disclosed that it consistently

---

[18] APCD Dust Investigation, Ex. 1-E at p. 17.

[19] A copy of the RG Lee Group Dust Study is attached hereto as Ex. 2.

[20] *Id.* at p. 14.

releases, on a yearly basis, thousands of tons of coal combustion particulates into the atmosphere through the Cane Run Site's stacks and from other sources discussed above.[21]

77.    The EPA's TRI summary of the Cane Run Site, shows that the Cane Run Site has been non-compliant with the CAA from at least October 2010 through the present.[22]

**C.    Coal Dust, Coal Ash, and Other Coal Combustion Byproducts Settle Both Outside and Inside Neighbors' Homes within a Five-Kilometer Radius of the Cane Run Site in Significant Quantities**

78.    The Cane Run Site is adjacent to residential neighborhoods containing thousands of homes.  It is also in close proximity to parks, schools, roads, restaurants, and shopping areas.

79.    The coal dust, fly ash, bottom ash, and other coal combustion byproducts released from the Cane Run Site have settled on the exteriors of surrounding homes and buildings, as well as on playgrounds, parks, lawns, pools, ponds, recreational items, and vehicles.

80.    The coal dust, fly ash, bottom ash, and other coal combustion byproducts have also migrated inside surrounding homes and buildings, where they settle in interior living and working spaces.

81.    In addition, the coal dust, fly ash, bottom ash, and other coal combustion byproducts have, in many cases, permeated portions of the homes including the external siding, internal drywall and wood surfaces, and HVAC systems.  As a result, the actual structures of homes cannot be cleaned of the arsenic, lead, chromium, silica and other hazardous substances without removing and replacing the building materials.

---

[21] Cane Run Site TRI Summary (at http://www2.epa.gov/toxics-release-inventory-tri-program); APCD Excess Emission Event Reports for 11/1/210 – 8/1/2013, attached hereto as Ex. 3.

[22] Cane Run Site TRI Summary (at http://www2.epa.gov/toxics-release-inventory-tri-program).

82.     Residents in areas surrounding the Cane Run Site are continually exposed to the threat of inhaling and ingesting coal dust, fly ash and its constituent components (including toxic metals and silica), bottom ash and its constituent components (including toxic metals and silica), and other byproducts of the coal combustion process.  Residents and those who visit their homes are exposed to this coal dust, coal ash, and these other byproducts in the same manner when they travel in cars through the areas surrounding the Cane Run Site as the vehicles' heating and air conditioning systems circulate particulates from the outside air through the vehicles.

83.     Coal dust, fly ash, bottom ash, and other coal combustion byproducts often travel four miles from the Cane Run Site to settle on homes and properties.

84.     The area within four miles of the Cane Run Site is particularly affected.  This area is exposed to the coal dust, fly ash, bottom ash, and other coal combustion byproducts that emanate from the Cane Run Site in quantities that are visible, damaging to property, and that pose significant danger to human health on a repeated and continual basis.

D.      **Health Risks of the Particles Emitted by the Cane Run Site**

85.     Fly ash is the finest of coal ash particles formed from the mineral matter in coal, consisting of the noncombustible matter in coal and small amounts of carbon that remain from incomplete combustion.[23]

86.     Arsenic and other toxic metals including chromium and lead that are contained in fly ash, bottom ash, and the other coal combustion byproducts generated, handled, stored, transported, and disposed of at the Cane Run Site are known human carcinogens and pose other significant risks to human health.[24]

---

[23] APCD Dust Investigation, Ex. 1-E, p. 19.

[24] EPA Regional Screening Levels for Toxic Substances (at http://www.epa.gov/reg3hwmd/risk/human/rb-concentration_table/index.htm).

87.     Fly ash and bottom ash also contain significant amounts of silica, which is a known cause of the lung disease, silicosis, and lung cancer.[25]

88.     The dangers of inhaling coal dust have been known for decades, given the extensive studies of coal dust's effects on coal miners.  Coal dust has been linked to lung disorders, including progressive massive fibrosis, chronic bronchitis, lung function loss, and emphysema.[26]

89.     A study by Duke University, in the aftermath of the coal ash spill at the Tennessee Valley Authority's Kingston, Tennessee plant in December 2008, concluded that one of the prime dangers of the spill was the "wind-blown re-suspension of fly ash into the atmosphere."[27]

90.     As a result of their toxic metal and silica content, among other substances, standard Material Safety Data Sheets indicate that both fly ash and bottom ash are designated as carcinogenic substances that require extensive handling precautions.[28]

91.     Cancer and silicosis are not the only dangers presented by the coal dust and coal combustion particulates released by the Cane Run Site, as both fly ash and bottom ash are eye, skin, and lung irritants.[29]

92.     With respect to the lungs, the dangers posed by fly ash extend beyond mere irritation.  As detailed in the medical literature, fly ash contains particles that are sufficiently fine

---

[25] *See* sample Class F Fly Ash Material Safety Data Sheet (attached hereto as Ex. 4); sample Bottom Ash Material Safety Data Sheet (attached hereto as Ex. 5).

[26] *See*, *e.g.*, Centers for Disease Control and Prevention Pocket Guide (at http://www.cdc.gov/niosh/npg/npgd0144.html ); "Mechanisms and Mediators in Coal Dust Induced Toxicity," *Ann. Occ. Hyg.*, Vol. 43, No. 1, pp. 7-33 (1999).

[27] "Survey of the Potential Environmental and Health Impacts in the Immediate Aftermath of the Coal Ash Spill in Kingston, Tennessee," *Environ. Sci. Tech.*, 43, 6326-6333 (2009), at 6330-31.

[28] *See* sample Class F Fly Ash Material Safety Data Sheet (attached hereto as Ex. 4); sample Bottom Ash Material Safety Data Sheet (attached hereto as Ex. 5).

[29] *Id.*

to be trapped deep in the lungs, where they can damage the lung lining, cause inflammation, inhibit immune response, and increase the risk of cardiopulmonary disease.[30]

93.      With respect to the eyes, contact with fly ash and bottom ash can cause severe mechanical irritation, such that material safety data sheets generally recommend that those exposed to these ashes wear dust-proof safety goggles.[31]

94.      Residents of the areas surrounding the Cane Run Site have complained to Defendant LG&E, as well as county, state, and federal officials regarding health problems stemming from exposure to coal dust and coal ash particulates released from the Cane Run Site. The health problems complained of include respiratory ailments, severe eye irritation, sensitivity to strong sulfur odors, and elevated cancer rates.  Residents have complained both verbally and in writing to, among others, Defendant LG&E, the APCD, the Kentucky Department for Environmental Protection, the EPA, and elected representatives.

## V.      FACTS PERTAINING TO THE NAMED PLAINTIFFS

### A.      Kathy Little

95.      Plaintiff Kathy Little lives in Louisville, Kentucky.  Her home is on the opposite side of Cane Run Road from the Cane Run Site.

96.      Mrs. Little has lived in this home since 1979.

97.      Mrs. Little's household includes her husband and her 10 year-old granddaughter.

98.      At the time she bought and moved into her home, the Coal Ash Landfill was not visible from her home or the surrounding area.

---

[30] *See* "Survey of the Potential Environmental and Health Impacts in the Immediate Aftermath of the Coal Ash Spill in Kingston, Tennessee," *Environ. Sci. Tech.*, 43, 6326-6333 (2009), at 6331.

[31] *See* sample Class F Fly Ash Material Safety Data Sheet (attached hereto as Ex. 4); sample Bottom Ash Material Safety Data Sheet (attached hereto as Ex. 5).

99.     Since at least 2008, Mrs. Little's house, lawn, and vehicles have been continuously covered by coal dust, coal ash, and coal combustion byproducts emitted from the Cane Run Site.  Subsequent to 2008, Mrs. Little estimates that these substances from the Cane Run Site have been deposited on her home on a near-daily basis.

100.    Mrs. Little's home served as a sampling location for tests performed in both the RG Lee Group Dust Study and the APCD Dust Investigation.  Both studies found that the samples taken from Mrs. Little's home showed significant amounts of fly ash.

101.    Coal dust, coal ash, and other coal combustion byproducts have migrated inside Mrs. Little's home and vehicles.  These substances permeate solid surfaces both inside and outside Mrs. Little's home.

102.    The coal dust, coal ash, and other coal combustion byproducts emanating from the Cane Run Site have negatively impacted Mrs. Little's quality of life and ability to live in her home in a normal manner.  The substances have often driven her and her family indoors and forced them to keep windows and doors closed – even in the summer.  Mrs. Little's yard and garden have been continually covered with coal dust, coal ash, and other coal combustion byproducts that she reasonably fears to be toxic.  She is hindered from grilling or even sitting in her yard, tending her garden, allowing her grand-daughter to play in her yard, or feeling comfortable inviting friends or family into her home.

103.    Mrs. Little has suffered thousands of dollars in property damage.  The coal dust, coal ash, and other coal combustion byproducts emanating from the Cane Run Site stick to surfaces and are difficult to remove, causing considerable damage over time.  The surfaces of her house cannot be simply wiped clean with water, chemical solutions are needed.  Because of the recurring frequency of the deposits, numerous aspects of her home have been damaged beyond

repair and require replacement.  Deposits from the Cane Run Site have similarly damaged her car, outdoor furniture, and other property.

104.    Mrs. Little and members of her household have suffered from respiratory ailments, eye irritation, skin irritation, and sensitivity to sulfur odors caused by the Cane Run Site's deposition of coal dust, coal ash, and other coal combustion byproducts on her property and home.[32]

105.    The Cane Run Site's deposition of coal dust, coal ash, and other coal combustion byproducts on Mrs. Little's property has contaminated the property, caused property damage, and unreasonably interfered with the quiet enjoyment of the property by Mrs. Little and the members of her household.

**B.    Greg and Debra Walker**

106.    Plaintiffs Greg and Debra Walker live in Louisville, Kentucky.  Their home is on the opposite side of Cane Run Road from the Cane Run Site.

107.    The Walkers have lived at this location for approximately 25 years.

108.    At the time they bought and moved into their home, the Coal Ash Landfill was not visible from their home or the surrounding area.

109.    The Walkers' household currently includes their 24 year-old son, their 16 year-old grandson, their 13 year-old grandson, and their 6 year-old granddaughter.

110.    Since at least 2008, the Walkers' house, lawn, and vehicles have been continuously covered by coal dust, coal ash, and other coal combustion byproducts emitted from

---

[32] Plaintiffs' claims for damages based on health effects caused by exposure to the materials emanating from the Cane Run Site are brought on an individual basis and not on behalf of the class.

the Cane Run Site. Subsequent to 2008, Mr. Walker estimates that these substances have been deposited on their home several times a month and often more frequently.

111. The Walkers' home served as a sampling location for tests performed in both the RG Lee Group Dust Study and the APCD Dust Investigation. Both studies found that the samples taken from the Walkers' home showed significant amounts of fly ash.

112. The coal dust, coal ash, and other coal combustion byproducts have migrated inside their home and vehicles, through windows, doors, vents, and possibly other routes.

113. The coal dust, coal ash, and other coal combustion byproducts that emanate from the Cane Run Site have negatively impacted the Walkers' quality of life and ability to live in their home. The coal dust, coal ash, and other coal combustion byproducts have often driven their family indoors and forced them to keep windows and doors closed – even in the summer. The Walkers' yard and garden have been repeatedly covered with coal dust, coal ash, and other coal combustion byproducts that they reasonably fear to be toxic. They are hindered from grilling or even sitting in their yard, tending their garden, allowing their grandsons and granddaughter to play in their yard, or feeling comfortable inviting friends or family into their home.

114. Mr. and Mrs. Walker have suffered thousands of dollars in property damage. The coal dust, coal ash, and other coal combustion byproducts emanating from the Cane Run Site stick to surfaces and are difficult to remove, causing considerable damage over time. The surfaces of their house cannot be simply wiped clean with water, chemical solutions are needed. Because of the recurring frequency of the deposits, numerous aspects of their home have been damaged beyond repair and require replacement. Deposits from the Cane Run Site have similarly damaged their car, outdoor furniture, and other property.

115.     The Walkers and other members of their household have suffered respiratory ailments, eye irritation, skin irritation, severe mental and physical ailments, and sensitivity to sulfur odors caused by Cane Run Site's deposition of coal dust, coal ash, and other coal combustion byproducts on their property and home.  On information and belief, these ailments, were directly caused by exposure to toxic chemicals contained in fly ash, bottom ash, and coal combustion byproducts that emanated from the Cane Run Site.[33]

116.     The Cane Run Site's deposition of coal dust, coal ash, and other coal combustion by-products on Mr. and Mrs. Walker's property has contaminated the property, caused property damage, and unreasonably interfered with the quiet enjoyment of the property and home by Mr. and Mrs. Walker and the members of their household.

## C.     Richard Evans

117.     Plaintiff Richard Evans lives in Louisville, Kentucky.  His home is on Bossier Lane.

118.     Mr. Evans has lived at this location since approximately 1969.

119.     At the time he bought and moved into his home, the Coal Ash Landfill was not visible from his home or the surrounding area.

120.     Since at least 2008, Mr. Evans' house, lawn, and vehicles have been continuously covered by coal dust, coal ash, and other coal combustion byproducts emitted from the Cane Run Site.  Subsequent to 2008, Mr. Evans estimates that these substances from the Cane Run Site have been deposited on his home at least several times a month and often more frequently.

---

[33] Plaintiffs' claims for damages based on health effects caused by exposure to materials emanating from the Cane Run Site are brought on an individual basis and not on behalf of the class.

121.    The coal dust, coal ash, and other coal combustion byproducts have migrated inside his home and vehicles, through windows, doors, vents, and possibly other routes.

122.    The coal dust, coal ash, and other coal combustion byproducts that emanate from the Cane Run Site have negatively impacted Mr. Evans' quality of life and ability to live in his home.  These byproducts have often driven him indoors and forced him to keep windows and doors closed – even in the summer.  His yard and garden have been repeatedly covered with coal dust, coal ash, and other coal combustion byproducts that he reasonably fears to be toxic.  They hinder him from grilling or even sitting in his yard, tending his garden, or feeling comfortable inviting friends or family into his home.

123.    Mr. Evans has suffered thousands of dollars in property damage.  The coal dust, coal ash, and other coal combustion byproducts emanating from the Cane Run Site stick to surfaces and are difficult to remove, causing considerable damage over time.  The surfaces of his house cannot be simply wiped clean with water, chemical solutions are needed.  Because of the recurring frequency of the deposits, numerous aspects of his home have been damaged beyond repair and require replacement.  Deposits from the Cane Run Site have similarly damaged his car, outdoor furniture, and other property.

124.    Mr. Evans has suffered respiratory ailments caused by Cane Run Site's deposition of coal dust, coal ash, and other coal combustion byproducts on his property and home.[34]

125.    The Cane Run Site's deposition of coal dust, coal ash, and other coal combustion byproducts on Mr. Evans' property has contaminated the property, caused property damage, and unreasonably interfered with his quiet enjoyment of the property and home.

---

[34] Plaintiffs' claims for damages based on health effects caused by exposure to the materials emanating from the Cane Run Site are brought on an individual basis and not on behalf of the class.

D.     **Phillip and Faye Whitaker**

126.     Plaintiffs Phillip and Faye Whitaker live in Louisville, Kentucky.  Their home is on Fury Way, approximately 3.8 miles from the Cane Run Site.

127.     The Whitakers have lived at this location for approximately 20 years.

128.     The Whitakers currently live in their home with their daughter and their granddaughter.  They raised their three children in their home and, at various times, have hosted several of their nine grandchildren for extended periods.

129.     Since at least 2008, the Whitakers' house, lawn, pool, and vehicles have been continuously covered by coal dust, coal ash, and other coal combustion byproducts emitted from the Cane Run Site.  Subsequent to 2008, Mr. Whittaker estimates these substances have been deposited on their home at least several times a month and often more frequently.

130.     The coal dust, coal ash, and other coal combustion byproducts have migrated inside their home and vehicles, through windows, doors, vents, and possibly other routes.

131.     The coal dust, coal ash, and other coal combustion byproducts that emanate from the Cane Run Site have negatively impacted the Whitakers' quality of life and ability to live in their home.  These materials have often driven their family indoors and forced them to keep windows and doors closed – particularly in the summer.  The Whitakers constantly find coal dust and ash coating surfaces and appliances inside their house.  They must wipe down each appliance with cleaning products before they are able to use them.

132.     The Whitakers have a swimming pool in their back yard.  Because of the coal dust, coal ash, and other coal combustion byproducts emanating from the Cane Run Site, the Whitakers must treat their pool with chemicals on a daily basis.  And each day, the pool is coated again with a film of coal dust and ash from the Cane Run Site.

133.     The Whitakers are hindered from spending time outside around their house.  They regularly experience feeling a film coating their skin that causes constant itching and that they describe as a feeling of bugs crawling on their skin.  The Whitakers often experience smelling a sulfuric odor and tasting a metallic taste each time they go outside their home.

134.     At the time they bought and moved into their home, the Whitakers did not experience the exposures to coal dust and coal ash described in the preceding paragraphs.

135.     Mr. and Mrs. Whitaker have suffered thousands of dollars in property damage. The coal dust, coal ash, and other coal combustion byproducts emanating from the Cane Run Site stick to surfaces and are difficult to remove, causing considerable damage over time.  The surfaces of their house cannot be simply wiped clean with water, chemical solutions are needed. Because of the recurring frequency of the deposits, numerous aspects of their home have been damaged beyond repair and require replacement.  Deposits from the Cane Run Site have similarly damaged their cars, outdoor furniture, and other property.

136.     The Whitakers and other members of their household have suffered severe ailments, respiratory ailments, eye irritation, skin irritation, and sensitivity to sulfur odors caused by Cane Run Site's deposition of coal dust, coal ash, and other coal combustion byproducts on their property and home.  On information and belief, these ailments were directly caused by exposure to toxic chemicals contained in fly ash, bottom ash, and coal combustion by-products that emanated from the Cane Run Site.[35]

137.     The Cane Run Site's deposition of coal dust, coal ash, and other coal combustion by-products on Mr. and Mrs. Whitaker's property has contaminated the property, caused

---

[35] Plaintiffs' claims for damages based on the health effects caused by exposure to materials emanating from the Cane Run Site are brought on an individual basis and not on behalf of the class.

property damage, and unreasonably interfered with the quiet enjoyment of the property and home by Mr. and Mrs. Whitaker and the members of their household.

## VI.    CLASS ACTION ALLEGATIONS

138.    Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

139.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3) on their own behalf and on behalf of all members of the class described below.

140.    Plaintiffs seek certification of a class ("Class") consisting of all current residents and owners of real property located in Kentucky within four miles of the Cane Run Site.

141.    Excluded from the Class are:  (a) the officers and directors of any of Defendants; (b) any judge or judicial officer assigned to this matter and his or her immediate family; (c) any legal representative, successor, or assign of any excluded persons or entities; (d) any class counsel or their immediate family members; and (e) any State or any of its agencies.

142.    The Class is so numerous that joinder of claims is impracticable. The disposition of the claims asserted herein through this class action will be more efficient and will benefit the parties and the Court.

143.    There are questions of law or fact common to the Class.

144.    Plaintiffs' claims are typical of the claims of the Class, because all claims arise from the same operative facts and are based on the same legal theories.

145.    The Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have retained competent and experienced counsel in matters such as these.  Plaintiffs and Counsel are committed to prosecuting this action vigorously on behalf of the Class and have

the financial resources to do so. Neither Plaintiffs nor Counsel have interests adverse to those of the Class.

146. Plaintiffs further bring this class action pursuant to Rule 23(b)(1), because prosecuting separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for the Defendants; adjudications with respect to individual Class Members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications and would substantially impair their ability to protect their interests.

147. Plaintiffs bring this class action under Rule 23(b)(2), because the parties opposing the Classes have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole. Such injunctive relief includes, but is not limited to, an injunction to require preventative measures to limit the damage to the Class Members' homes and personal property, the cleanup and mitigation of harm to the Class Members' homes and personal property to the extent possible, and an order requiring Defendants to institute remedial measures sufficient to permanently prevent any coal dust, fly ash, bottom ash, toxic metals, and other coal combustion particulates from escaping from the Cane Run Site. Such declaratory relief includes, but is not limited to, a declaration that Defendants' liability is not limited by the Limited Liability Act or other statute and that Defendants acted with negligence, gross negligence, and/or willful, wanton, and careless disregard for the Plaintiffs' and the Class Members' health, safety, and property.

148. Plaintiffs bring this class action pursuant to Rule 23(b)(3) and Rule 23(c)(4), because there are questions of law and fact common to the Class that predominate over any

questions affecting only individual Class Members.  Some of these common questions of law and fact common to the Class include, but are not limited to:

(a)  Whether coal ash or other particulates were deposited on Class Members' properties;

(b)  Whether the coal ash and other particulates that were deposited on Class Members' property emanated from the Cane Run Site;

(c)  Whether the measures the Cane Run Defendants implemented to prevent the release of its emissions on surrounding neighborhoods were effective and sufficient;

(d)  Whether the materials deposited on Class Members' properties might endanger human health;

(e)  Whether injunctive relief, and the assessment of civil penalties and other relief are appropriate under RCRA;

(f)  Whether injunctive relief, the assessment of civil penalties and other relief are appropriate under the CAA;

(g)  whether the Defendants committed negligence, gross negligence, and/or acted with willful, wanton, or careless disregard by allowing coal-related particulates to emanate from their property;

(h)  whether the Defendants have trespassed on the Class Members' properties;

(i)  whether Defendants have created a nuisance with respect to the Class Members' properties by unreasonably interfering with their use and enjoyment of their respective properties;

(j)     whether the nuisance created can be remediated and therefore whether the

nuisance is of a temporary or permanent nature; and

(k)     what are the types of damages to which Class Members are entitled.

149.    In addition, a class action is superior to other available methods for the fair and

efficient adjudication of the controversy. The expense and burden of litigation would

substantially impair the ability of many Class Members to pursue individual cases to protect their

rights. Absent class treatment, Plaintiffs and the Class Members will continue to suffer harm and

damages as a result of Defendants' unlawful and wrongful conduct.

## VII.    DAMAGES SOUGHT BY THE CLASS

150.    The following categories of monetary damages sought are common to Plaintiffs

and Class Members:

(a)     Monetary damages reflecting the cost to remediate Plaintiffs' and Class

Members' properties of the contamination caused by Defendants' conduct

or, in the alternative, to compensate Plaintiffs and Class Members for the

diminution in value of their properties caused by Defendants' conduct;

(b)     Monetary damages to compensate Plaintiffs and Class Members for the

loss of the use and enjoyment of their properties caused by Defendants'

conduct; and

(c)     Statutory damages for Defendants' violation of RCRA and the CAA,

including the assessment of civil penalties to be paid to the U.S. Treasury

and an award of attorney fees and the costs of this litigation.

151.    The following injunctive relief sought is common to Plaintiffs and Class

Members.  Specifically, Plaintiffs seek, on behalf of themselves and the Class, injunctive relief

under RCRA, the CAA, and Kentucky law, in the form of an Order enjoining Defendants from

activities which allow coal dust, fly ash, bottom ash, and other coal combustion byproducts to escape the Cane Run Site.  At a minimum, such relief must order Defendants to:

     (a)     cover the Coal Ash Landfill, Ash Treatment Basin, Ash Ponds, and any other storage locations with the appropriate material and with sufficient frequency to prevent particulates from being emitted off the Cane Run Site;

     (b)     establish controls sufficient to prevent coal dust from escaping the Coal Storage Pile and being emitted off of the Cane Run Site;

     (c)     repair or replace the Sludge Plant, so that it does not allow fly ash, bottom ash, and coal combustion byproducts to be emitted off of the Cane Run Site;

     (d)     operate the systems used to capture fly ash, bottom ash, and other coal combustion byproducts during the coal combustion process in accordance with all applicable laws and regulations, and ensure that these systems are always in operation when the boilers are in use; and

     (e)     ensure that Stack emissions do not exceed allowable opacity and particulate emission limits, per applicable laws and regulations.

152.     Plaintiffs and the members of the Class have each been continually subjected to substances that emanated from the Cane Run Site and that have the potential to cause serious harm to their health.  While the questions of liability and property damage will be common to all Class Members, Plaintiffs recognize that the health effects caused by the waste the Cane Run Defendants deposited on their homes will be unique to each individual.  Plaintiffs therefore intend to seek certification only of common issues under Rule 23(c)(4), and will not seek to

certify damages based on the illnesses and health effects caused by the exposure to the toxic substances in the coal dust, coal ash, and coal combustion byproducts that Defendants released.

## VIII.   SERVICE OF NOTICE OF INTENT TO SUE PURSUANT TO RCRA AND THE CAA

153.    On September 6, 2013, Plaintiffs served a Notice of Intent to Sue ("Notice") pursuant to RCRA, 42 U.S.C. § 6972(b)(1)(A) and 42 U.S.C. § 6972(b)(2)(A), and the CAA, 42 U.S.C. §7604(b)(1)(A), on the Cane Run Defendants.  A copy of this Notice is attached as Ex. 1.

154.    The Notice was also served on the Administrator and Regional Administrator of the EPA, the Attorney General of the United States, the Commissioner of the Kentucky Department for Environmental Protection, the Director of the Kentucky Department for Environmental Protection's Division of Waste Management, and the Director of the APCD.

## IX.     CAUSES OF ACTION

### COUNT I
### (VIOLATION OF RCRA, 42 U.S.C. § 6972(A)(1)(A)) Against All Defendants

155.    Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

156.    RCRA, 42 U.S.C. § 6972(a)(1)(A), permits a citizen suit against any person in "violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter."

157.    The Cane Run Defendants are persons, within the meaning of §6972(a)(1)(A).

158.    Fly ash, bottom ash, and the other particulates produced by coal combustion on the Cane Run Site are regulated solid wastes under RCRA.  *See* 40 C.F.R. § 261.4(b)(4).

159.    Certain constituents of the fly ash, bottom ash, and the other particulates produced by coal combustion on the Cane Run Site (including the toxic metals arsenic, chromium, and

lead) are toxic contaminants which can mandate that a waste be deemed hazardous under RCRA. *See* 40 C.F.R. § 261.24.[36]

160.    The Cane Run Defendants generate, handle, store, treat, transport, and dispose of these solid wastes and toxic contaminants on the Cane Run Site.

161.    The Cane Run Defendants have failed to take adequate steps to control the emission from the Cane Run Site of fly ash, bottom ash, and other particulates produced by the coal combustion process, as well as the toxic contaminants in these materials.  As a result, regular and repeated emissions of these solid wastes and toxic contaminants have taken place on at least a weekly basis since at least 2008 and continue to take place on at least a weekly basis from the Cane Run Site's Landfill, Ash Treatment Basin, Ash Ponds, Sludge Plant, Ash Silo, roads, and Stacks, as well as from uncovered trucks operated by the Cane Run Defendants.

162.    These emissions are regularly in the form of dust and ash traveling in the air, as well as in the form of storm water runoff from the Cane Run Site.  The emitted solid and hazardous wastes travel miles beyond the boundaries of the Cane Run Site and are deposited on homes, lawns, roads, cars, schools, parks, pools, ponds, recreational items, and other locations. These solid wastes and toxic contaminants have also migrated into the interiors of homes and buildings, where inhabitants are subjected to regular and frequent exposure to them through inhalation, skin contact, and ingestion.

163.    The Cane Run Defendants' aforementioned waste activities are in violation of RCRA including, but not limited to, RCRA's requirement that a solid waste landfill such as the Coal Ash Landfill be properly covered in accordance with 40 C.F.R. § 258.21, and that a solid waste landfill comply with the air criteria set forth in 40 C.F.R. § 258.24.

---

[36] As set forth herein, the fly ash, bottom ash, and the other particulates produced by coal combustion on the Cane Run Site also contain silica.

164.    The Cane Run Defendants' aforementioned solid and hazardous waste activities are in violation of at least the following Kentucky waste management regulations, which have been adopted by the EPA pursuant to RCRA, and thus constitute violations of RCRA:

(a)    401 KAR 30:031, Section 9(2), for violation of air pollution requirements contained in KRS Chapter 224 or 401 KAR Chapters 50 to 63, as described in Count III (Violation of the CAA) herein;

(b)    401 KAR 30:031, Section 11, for constituting "a public nuisance because of blowing litter, debris, or other waste or material," specifically blowing coal dust, fly ash, bottom ash, and other particulates produced by the coal combustion process;

(c)    401 KAR 45:110, Section 1, for failing to insure that the Cane Run Site's "engineering design for a special waste landfill [] demonstrate[s] compliance with 401 KAR 30:031";

(d)    401 KAR 45:110, Section 3(2), for failing to operate the Cane Run Site "in such a manner to ensure compliance with 401 KAR 30:031";

(e)    401 KAR 45:110, Section 3(3), for failing to inspect the Cane Run Site and its operations "at a sufficient frequency to ensure compliance with 401 KAR 30:031";

(f)    401 KAR 45:130, Section 1(1), for failing to site solid and hazardous wastes more than 250 feet from the Ohio River;

(g)    401 KAR 45:140, Section 1(4), for violating the Cane Run Site's special waste permit and subsequently failing to "take all reasonable steps to minimize releases to the environment, and [] carry[ing] out such measures

as are reasonable to prevent significant adverse impacts on human health and the environment";

(h)     401 KAR 45:140, Section 1(5), for failing to "at all times properly operate and maintain all facilities and systems of treatment and control that are installed or used by the owner or operator to achieve compliance with the conditions of the [special waste] permit"; and

(i)     401 KAR 48:090, Section 3, for failing to properly place covering materials on all solid wastes contained in the Coal Ash Landfill, Ash Treatment Basin, and ash ponds.

165.    As a result of the foregoing conduct, Plaintiffs are entitled to injunctive relief, the assessment of civil penalties under RCRA, reasonable costs of litigation including attorneys' fees and expert witness fees, and all other relief which the Court deems just and proper.

## COUNT II
## (VIOLATION OF RCRA, 42 U.S.C. § 6972(A)(1)(B))
## Against All Defendants

166.    Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

167.    RCRA, 42 U.S.C. § 6972(a)(1)(B), permits a citizen suit against any person "including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment."

168.    The Cane Run Site is a treatment, storage, or disposal facility, pursuant to 42 U.S.C. § 6972(a)(1)(B).

169.    The Cane Run Defendants are past or present generators, transporters, owners or operators of the Cane Run Site, within the meaning of § 6972(a)(1)(B).

170.    Fly ash, bottom ash, and the other particulates produced by coal combustion on the Cane Run Site are regulated solid wastes under RCRA.  *See* 40 C.F.R. § 261.4(b)(4).

171.    Certain constituents of the fly ash, bottom ash, and the other particulates produced by coal combustion on the Cane Run Site (including the toxic metals arsenic, chromium, and lead) are toxic contaminants which can mandate that a waste be deemed hazardous, under RCRA.  *See* 40 C.F.R. § 261.24.

172.    The Cane Run Defendants have failed to take adequate steps to control the emission from the Cane Run Site of fly ash, bottom ash, and other particulates produced by the coal combustion process, as well as the toxic contaminants contained in these materials.

173.    As a result, regular and repeated emissions of these solid wastes and toxic contaminants have taken place on at least a weekly basis since at least 2008 and continue to take place on at least a weekly basis from the Cane Run Site's Landfill, Ash Treatment Basin, Ash Ponds, Sludge Plant, Ash Silo, roads, and Stacks, as well as from uncovered trucks operated by the Cane Run Defendants.

174.    These emissions are regularly in the form of dust and ash traveling in the air, as well as in the form of storm water runoff from the Cane Run Site.

175.    The emitted solid wastes and toxic contaminants travel miles beyond the boundaries of the Cane Run Site and are deposited on homes, lawns, roads, cars, schools, parks, pools, ponds, recreational items, and other locations.

176.    These solid wastes and toxic contaminants have also migrated into the interiors of homes and buildings, where inhabitants are subjected to regular and frequent exposure to them through inhalation, ingestion, and skin contact.

177.    Thus, residents and those who work in areas surrounding the Cane Run Site are regularly and frequently exposed to the threat of inhaling and ingesting fly ash, bottom ash, other particulates produced by the coal combustion process, and toxic contaminants.

178.    Members of the public are also exposed to these solid wastes and toxic contaminants in the same manner when, for example, they travel through the areas surrounding the Cane Run Site or use the exercise path which runs along the Cane Run Site.

179.    Individuals riding in cars in areas surrounding the Cane Run Site are also exposed to these solid wastes and toxic contaminants as the vehicles' heating and air conditioning systems circulate particulates from the outside air through the vehicles.

180.    As set forth herein, fly ash, bottom ash, and the other coal combustion byproducts emitted from the Cane Run Site are hazardous to human health.

181.    As a result of repeated and continuing exposure to fly ash, bottom ash, and other particulates produced by the coal combustion process, local residents have experienced and complained to government officials of respiratory infections and other breathing difficulties, severe eye irritation, headaches, and increased rates of cancer.

182.    Consequently, the Cane Run Defendants' activities "may present an imminent and substantial endangerment to health or the environment," in violation of RCRA, 42 U.S.C. 6972(a)(1)(B).

183.    As a result of the foregoing conduct, Plaintiffs are entitled to injunctive relief, the assessment of civil penalties under RCRA, reasonable costs of litigation including attorneys' fees and expert witness fees, and all other relief which the Court deems just and proper.

## COUNT III
### (VIOLATION OF THE CAA, 42 U.S.C. § 7604(A)(1))
### Against All Defendants

184.    Plaintiffs incorporate the foregoing paragraphs as though the same were set forth

at length herein.

185.    Under the CAA, any person may commence a civil action against a person who

owns, leases, operates, controls, or supervises an emission source that is alleged to have violated

an "emission standard or limitation."  42 U.S.C. § 7604(a)(1).

186.    Defendants own, operate, control, and supervise the Cane Run Site, within the

meaning of 42 U.S.C. § 7604.

187.    "Emission standard or limitation" is defined, in relevant part, as "any other

standard, limitation, or schedule established under any permit issued pursuant to subchapter V of

this chapter or under any applicable State implementation plan approved by the Administrator,

any permit term or condition, and any requirement to obtain a permit as a condition of

operations."  42 U.S.C. § 7604(f)(4).

188.    As set forth below, the Cane Run Defendants' activities violated and continue to

violate the Cane Run Site's Operating Permit, issued pursuant to Title V of the CAA, and

regulations which are part of Kentucky's State Implementation Plan ("SIP") under the CAA.

189.    The Notices of Violations, dated July 22, 2011, November 3, 2011, July 9, 2012,

October 27, 2012, June 5, 2013, and August 2, 2013, set forth violations by Cane Run Defendant

LG&E of the following APCD regulations:

      (a)     Violation of APCD Regulation 1.14 (amended 1/20/88), Section 02,

             Subsection 04; Title:  Control of Fugitive Particulate Emissions; Short

             Name:  Visible Fugitive Emissions Beyond the Property:

                   "LG&E allowed flyash particulate emissions to enter the air and be
                   carried beyond their property line, settling onto surrounding

neighborhood properties.  This deposition was observed by the District in December 2010, and February and April, 2011." (July 22, 2011 NOV.)

(b)     Violation of APCD Regulation 1.09 (amended 11/16/83), Section 0; Title:

Prohibition of Air Pollution; Short Name:  General Prohibition on Air

Pollution:

"On June 21, July 29, and August 4, 11, 12, and 22, 2011, source emitted clouds of dust into the atmosphere from its sludge processing plant that caused nuisance and annoyance to the residents of the neighborhood that surround it."  (Nov. 3, 2011 NOV.)

(c)     Violation of APCD Regulation 1.14 (amended 1/20/88), Section 02,

Subsection 01; Title:  Control of Fugitive Particulate Emissions; Short

Name:  Failure to Take Reasonable Precautions to Prevent:

"On July 15, 18, and 30, 2011, the source failed to take reasonable precautions to prevent particulate matter from becoming airborne beyond the work site."  (Nov. 3, 2011 NOV.)

(d)     Violation of APCD Regulation 1.07 (amended 6/21/05), Section 04,

Subsection 01; Title:  Excess Emissions During Startups, Shutdowns, and

Upset Conditions; Short Name:  Failure to Report Excess Emissions:

"Source failed to report excess particulate emissions from the sludge processing plant on August 4, 11, 12, and 19, 2011."  (Nov. 3, 2011 NOV.)

(e)     Violation of APCD Regulation 1.14 (amended 1/20/88), Section 02,

Subsection 04; Title:  Control of Fugitive Particulate Emissions; Short

Name:  Visible Fugitive Emissions Beyond the Property Line:

"The Source had equipment failure that resulted in a discharge of dry ash and lime and visible emissions to leave the property."  (July 9, 2012 NOV.)

(f)     Violation of APCD Regulation 1.13 (amended 06/17/98), Section 02;

Title:  Control of Objectionable Odors in the Ambient Air; Short Name:

Failure to Control Objectionable Odors:

> "On March 14, April 3, April 6, April 26, and June 20, 2012, the source allowed objectionable sulfur odors to be emitted into the ambient air.  The objectionable odors were present in the surrounding neighborhood, causing a nuisance to the residents and resulting in complaints to the District."  (July 9, 2012 NOV.)

(g)     Violation of APCD Regulation 1.14 (amended 1/20/88), Section 02,

Subsection 01; Title:  Control of Fugitive Particulate Emissions; Short

Name:  Failure to Take Reasonable Precautions to Prevent:

> "A pipe elbow ruptured releasing 406 pounds of fly ash into the atmosphere.  The pipe is not a permitted a release point, but should be a closed system."  (July 9, 2012 NOV.)

(h)     Violation of APCD Regulation 1.14 (amended 1/20/88), Section 02,

Subsection 01; Title:  Control of Fugitive Particulate Emissions; Short

Name:  Failure to Take Reasonable Precautions to Prevent:

> "Source allowed particulate matter to become airborne beyond the work site.  The source has not demonstrated that its modifications to the SPP has eliminated the unpermitted discharge of particulate matter from the mixer to the atmosphere."  (July 9, 2012 NOV.)

(i)     Violation of APCD Regulation 1.14 (amended 1/20/88), Section 02,

Subsection 04; Title:  Control of Fugitive Particulate Emissions; Short

Name:  Visible Fugitive Emissions Beyond the Property Line:

> "The source allowed visible fugitive dust emissions to travel from the ash landfill, an in-plant road, and the SPP and to cross the plant's property line onto the neighboring residential area."  (July 9, 2012 NOV.)

(j)    Violation of APCD Regulation 1.14 (amended 1/20/88), Section 02,

Subsection 04; Title:  Control of Fugitive Particulate Emissions; Short

Name:  Visible Fugitive Emissions Beyond the Property Line:

"Source allowed visible fugitive dust emissions to travel over the plant's property line onto property of residential neighbors."  (July 9, 2012 NOV.)

(k)    Violation of APCD Regulation 1.07 (amended 6/21/05), Section 04,

Subsection 01; Title:  Excess Emissions During Startups, Shutdowns, and

Upset Conditions; Short Name:  Failure to Report Excess Emissions:

"The source failed to notify the District of this upset condition until four days after the event, and only after receiving a request from the District.  In addition, the source failed to submit a report within 15 days of excess emissions that includes measures it took to reduce excess emissions during the event, as well as, steps it will take to prevent or minimize similar excess emission events in the future." (July 9, 2012 NOV.)

(l)    Violation of APCD Regulation 7.08 (amended 3/17/99), Section 03,

Subsection 01; Title:  Standard or Performance – New Process Operations;

Short Name:  Excess Opacity or Particulate Matter:

"Video evidence shows the source caused opacity emissions of greater than 20% for at least 6 minutes to be released while balancing the fans in Unit 5."  (July 9, 2012 NOV.)

(m)    Violation of APCD Regulation 1.09 (amended 11/16/83), Section 0; Title:

Prohibition of Air Pollution; Short Name:  General Prohibition on Air

Pollution:

"The source released an estimated 39.1 lbs. of fly ash from the stack of Unit 5 while balancing the fans.  The unit was not in operation at the time, therefore the permit lb/mm Btu limit is not applicable.  The source is not permitted to exhaust from the stack when not in operation."  (July 9, 2012 NOV.)

(n)     Violation of APCD Regulation 1.05 (amended 11/18/92), Section 5; Title:

Compliance with Emission Standards & Maintenance; Short Name:

Failure to Use Good Air Pollution Control Practice:

> "The source failed to operate the SPP in a manner consistent with good air pollution control practices for minimizing emissions when the SPP experienced an equipment failure and the process was not shut off immediately, which created a large, thick cloud of dust around and drifting away from the SPP." (Oct. 27, 2012 NOV.)

(o)     Violation of APCD Regulation 1.14 (amended 1/20/88), Section 02,

Subsection 01; Title:  Control of Fugitive Particulate Emissions; Short

Name:  Failure to Control Fugitive Particulate Emissions:

> "On eight days (June 8, June 29, July 1, July 14, July 18, July 31, and August 16) in 2012, the source failed to take reasonable precautions to prevent particulate matter from becoming airborne beyond the work site." (June 5, 2013 NOV.)

(p)     Violation of APCD Regulation 1.14 (amended 1/20/88), Section 02,

Subsection 04; Title:  Control of Fugitive Particulate Emissions; Short

Name:  Visible Fugitive Emissions Beyond the Property:

> "Source allowed visible fugitive emissions to cross the property line onto property of residential neighbors." (June 5, 2013 NOV.)

(q)     Violation of APCD Regulation 1.14 (amended 1/20/88), Section 02,

Subsection 04; Title:  Control of Fugitive Particulate Emissions; Short

Name:  Visible Fugitive Emissions Beyond the Property:

> "The source had an equipment failure that resulted in a discharge of fly ash and visible emissions to leave the property." (June 5, 2013 NOV.)

(r)     Violation of APCD Regulation 1.13 (amended 06/17/98), Section 02;

Title:  Control of Objectionable Odors in the Ambient Air; Short Name:

Failure to Control Objectionable Odors:

"On 13 consecutive days (June 2-14, 2013), the source caused and allowed objectionable sulfur odors to leave the property site. The objectionable odors were present in the surrounding neighborhood, causing a nuisance to the residents and resulting in complaints to the District."  (August 2, 2013 NOV.)

190.    Each of the APCD Regulations listed in the aforementioned Notices of Violation, with the exception of APCD Regulation 1.13, has been adopted by the EPA as part of Kentucky's SIP, under the CAA.[37]

191.    Further, each of these APCD Regulations, with the exception of APCD Regulation 1.13, has been incorporated into the Cane Run Site's operating permit under Title V of the CAA.  *See* Cane Run Site's Title V Operating Permit, attached hereto as Exhibit 1-H.

192.    The Cane Run Defendants' violations of these APCD Regulations and its Title V Operating Permit are violations of the CAA, pursuant to 42 U.S.C. § 7604(a)(1).

193.    Further, substantially similar violations to those that are the subject of the APCD NOV's are continuing on at least a weekly basis at the Cane Run Site because the Cane Run Defendants have failed to implement measures to control the emission of coal dust, fly ash, bottom ash, and other particulates produced by the coal combustion process from the Landfill, the Ash Treatment Basin, the Ash Ponds, the Sludge Plant, the Ash Silo, roads on the Cane Run Site, and the Stacks at the Cane Run Site, as well as from trucks operated by the Cane Run Defendants.

194.    In addition, in violation of § 7604(a)(1) of the CAA, Defendants have continued to operate the Cane Run Site notwithstanding that the Cane Run Site's Title V Operating Permit expired in 2007 and has not been renewed.

---

[37] *See* http://www.ecfr.gov/cgi-bin/text-idx?type=simple;c=ecfr;cc=ecfr;sid=610316a3cafbe3c96635708a9ae538cf;idno=40;region=DIV1;q1=Jefferson%20County%20Kentucky;rgn=div6;view=text;node=40%3A3.0.1.1.1.19 .

195.    In further violation of the CAA, the Cane Run Defendants' activities regularly exceed the 20% opacity limit set by the Cane Run Site's Operating Permit, with respect to the Stacks, the Sludge Plant, and the Ash Silo.  These opacity violations occur, on information and belief, on at least a weekly basis.

196.    The EPA's TRI summary of the Cane Run Site, shows that the Cane Run Site has been non-compliant with the CAA from at least October 2010 through the present.[38]

197.    The Cane Run Site's Operating Permit does not allow particulate emissions from the Cane Run Site's Landfill, Ash Treatment Basin, Ash Ponds, Ash Silo, roads on the Cane Run Site, or from trucks operated by the Defendants.  As a result, particulate emissions from these sources are also violations of the CAA and are continuing on at least a weekly basis.

198.    As a result of the foregoing conduct, Plaintiffs are entitled to injunctive relief, the assessment of civil penalties under the CAA, reasonable costs of litigation including attorneys' fees and expert witness fees, and all other relief which the Court deems just and proper.

## COUNT IV
### (PERMANENT NUISANCE)
### Against Defendant LG&E

199.    Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

200.    The actions of the Defendant constitute a continuing and recurring nuisance as defined by Kentucky Law.[39]

201.    Defendant LG&E's use of its property causes unreasonable and substantial annoyance to neighboring occupants.  The Cane Run Site causes dangerous and harmful

---

[38] Cane Run Site TRI Summary (at http://www2.epa.gov/toxics-release-inventory-tri-program).

[39] *See* Ky. Rev. Stat. Ann. § 411.530(2).

particulates to be deposited on Plaintiffs' and Class Members' property.  The materials emanating from the Cane Run Site are deposited on the residential homes in the surrounding area and contain toxic substances including arsenic, chromium, lead, and silica in concentrations that pose significant risks to human health.

202.    The emissions from the Cane Run Site cause injury to the Plaintiffs and to members of the Class in that the substances deposited on their respective properties interfere with the Plaintiffs' and each Class Member's quiet use and enjoyment of their property.

203.    On information and belief, such nuisance is a permanent nuisance as the emissions cannot be corrected or abated at reasonable expense to the owner and are relatively enduring and not likely to be abated voluntarily or by court order.[40]

204.    The Plaintiffs should recover damages from the permanent nuisance caused by the Defendant in the amount of the lost value of their respective properties.[41]

## COUNT V
## (TEMPORARY NUISANCE)[42]
### Against Defendant LG&E

205.    Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

206.    The actions of Defendant LG&E constitute a continuing and recurring nuisance as defined by Kentucky Law.[43]  The Cane Run Site causes dangerous and harmful particulates, including but not limited to coal dust, fly ash, and bottom ash to be deposited on Plaintiffs' and

---

[40] *See* Ky. Rev. Stat. Ann. § 411.530(1)(a)

[41] Ky. Rev. Stat. Ann. § 411.560(1)(a)

[42] Whether a nuisance is permanent or temporary is a question of fact that turns, inter alia, on the ability of and cost to the defendant to abate the offending condition of their plant.  *See Signal Mountain Portland Cement Co. v. Brown*, 141 F.2d 471, 475 (6th Cir. 1944) (cited in *Barnette v. Grizzly Processing, LLC*, 809 F. Supp. 2d 636, 654-55 (E.D. Ky. 2011)).

[43] *See* Ky. Rev. Stat. Ann. § 411.540; § 411.530(2)

Class Members' properties.  The materials emanating from the Cane Run Site and deposited on the residential homes in the surrounding area contain toxic substances including arsenic, chromium, lead, and silica in concentrations that pose significant risks to human health.

207.    The emissions from the Cane Run plant cause injury to the Plaintiffs and to members of the Class in that the substances deposited on each of their homes and their property cause unreasonable and substantial annoyance to the Plaintiffs and to each Class Member and interfere with their quiet use and enjoyment of their respective properties.

208.    On information and belief, such nuisance is a temporary nuisance that can be abated.

209.    The Defendant should be permanently enjoined to abate the nuisance it is causing and Plaintiffs should recover damages from the temporary nuisance caused by the Defendant as provided by Kentucky law.[44]

## COUNT VI
## (TRESPASS)
## Against Defendant LG&E

210.    Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

211.    The Cane Run Site causes particles and pollutants to be spread through the air and deposited on the real and personal property of the Plaintiffs and the members of the Class.

212.    The particles and pollutants that Defendant LG&E caused to spread through the air and to be deposited on the property of the Plaintiffs and the members of the Class constitute

---

[44] *See* Ky. Rev. Stat. Ann. § 411.560(1)(b).

an unreasonable interference with the Plaintiffs' and Class Members' possessory use of their respective properties.  The actions of the Defendant therefore constitute a trespass.[45]

213.    Such trespass is without right or license and violates the exclusive property rights of the Plaintiffs and the members of the Class.

214.    The Defendant should be permanently enjoined to cease its trespass on the property of the Plaintiffs and the members of the Class.

215.    Plaintiffs should recover damages from the trespass caused by the Defendant.

**COUNT VII**
**(NEGLIGENCE *PER SE*)**
**Against Defendant LG&E**

216.    Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

217.    Defendant LG&E is in violation of certain statutes and regulations enacted to prevent air pollution and to prevent the emission of materials and odors causing nuisance conditions.  Defendant failed to properly investigate, monitor, and prevent the emissions of toxic and/or hazardous air pollutants and failed to use the utmost care to prevent such emissions.  Such failure constitutes negligence per se.

218.    Plaintiffs and members of the Class are within the class of persons for whose benefit the statutes and regulations were enacted.  The harm to Plaintiffs and to members of the Class is the harm which the statutes and regulations were designed to prevent.

219.    Plaintiffs and members of the Class are each entitled to compensation for the damages caused by or contributed to by the Defendant's negligence.

---

[45] *See Smith v. Carbide & Chemicals Corp.*, 226 S.W.3d 52, 56-57 (Ky. 2007).

## COUNT VIII
## (NEGLIGENCE)
### Against Defendant LG&E

220.    Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

221.    Defendant LG&E knew or should have known that the manner in which it stored coal, burned coal, and treated coal combustion byproducts would cause coal dust, coal ash and other coal combustion byproducts to be deposited on the surrounding neighborhoods.

222.    Defendant knew or should have known that the manner in which it stored and disposed of its coal and coal combustion byproducts made it likely that coal dust, coal ash and other harmful materials would leave the Cane Run Site and coat the surrounding neighborhoods.

223.    Defendant knew or should have known that measures that would have ensured that coal dust, coal ash, and other coal combustion byproducts would be effectively contained within the Cane Run Site were available and could be employed, yet Defendant chose not to employ the available effective measures.

224.    Defendant had a duty to take all reasonable measures to ensure that its coal dust, coal ash, and other coal combustion byproducts would not invade the homes of the Plaintiffs and the members of the Class.

225.    Defendant breached the above-stated duty.

226.    Defendant's breach proximately caused Plaintiffs and members of the Class to suffer injury.

## COUNT IX
## (GROSS NEGLIGENCE; WILLFUL OR WANTON MISCONDUCT)
### Against Defendant LG&E

227.    Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

228.     Defendant LG&E was repeatedly and specifically notified that the measures it was taking to contain their coal dust, coal ash, and other coal combustion byproducts were ineffective and that its neighbors were continually being exposed to harmful materials.

229.     Defendant commissioned its own testing that confirmed that coal dust, fly ash, bottom ash, and other coal combustion byproducts were repeatedly leaving the Cane Run Site and settling on the surrounding neighborhoods.

230.     Defendant knew that the coal dust, fly ash, bottom ash, and other coal combustion byproducts contain arsenic, lead, silica, chromium, and other materials that are hazardous to human health.

231.     Defendant knew that the manner in which it stored coal, burned coal, and treated coal combustion byproducts would cause coal dust, coal ash, and other coal combustion byproducts to be deposited on the surrounding neighborhoods.

232.     Defendant knew that the manner in which it stored and disposed of its coal and coal combustion byproducts made it likely that coal dust, coal ash and other harmful materials would leave the Cane Run Site and coat the surrounding neighborhoods.

233.     Defendant knew that measures that would have ensured that coal dust, coal ash, and other coal combustion byproducts would be effectively contained within the Cane Run Site were available, yet Defendant chose not to employ available effective measures.

234.     Defendant's actions were grossly negligent and/or in willful and wanton disregard for the health, safety, and property of the Plaintiffs and members of the Class.

235.     Defendant's conduct caused injury to Plaintiffs and to the members of the Class.

236.    Defendant's willful and wanton misconduct entitles Plaintiffs and the members of the Class to punitive and exemplary damages.[46]

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief:

A.    Certify this case as a class action and appoint the named Plaintiffs to be Class representatives and their counsel to be Class counsel;

B.    Enter a judgment declaring the acts and practices of the Cane Run Defendants to violate RCRA and the CAA;

C.    Enter a judgment declaring the acts and practices of the Cane Run Defendants to constitute nuisance and trespass under Kentucky law;

D.    Enter a judgment declaring the acts and practices of the Cane Run Defendants to constitute negligence under Kentucky law;

E.    Enter a judgment declaring the acts and practices of the Cane Run Defendants to constitute gross negligence, and willful or wanton misconduct under Kentucky law;

F.    Grant a permanent or final injunction enjoining the Cane Run Defendants from allowing coal dust, fly ash, bottom ash, or other coal combustion byproducts from escaping the Cane Run Site;

G.    Grant a permanent or final injunction requiring the Cane Run Defendants to take affirmative measures that will ensure that coal dust, fly ash, bottom ash, or other coal combustion byproducts will not escape the Cane Run Site, including but not limited to reducing the size of the Coal Ash Landfill to its pre-1999 size;

H.    Award monetary damages reflecting the cost to remediate Plaintiffs' and Class Members' properties of the contamination caused by Defendants' conduct or, in the alternative,

---

[46] *See Williams v. Wilson*, 972 S.W.2d 260, 264 (Ky. 1998).

to compensate Plaintiffs and Class Members for the diminution in value of their properties caused by Defendants' conduct;

I.       Award monetary damages to compensate Plaintiffs and Class Members for the loss of the use and enjoyment of their properties caused by Defendants' conduct;

J.       Award punitive and exemplary damages;

K.       Impose civil penalties under RCRA and the CAA to be paid by the Defendants to the U.S. Treasury.

L.       Award Plaintiffs the costs of this action, including the fees and costs of experts together with reasonable attorneys' fees; and

M.       Grant Plaintiffs and the Class Members such other and further relief as this Court finds necessary and proper.

## XI.       JURY DEMAND

Plaintiffs hereby demand a trial by jury on any and all matters so triable.

DATED this 16th day of December, 2013.


JEFFREY M. SANDERS PLLC


By:  _s/ Jeffrey M. Sanders_____
        Jeffrey M. Sanders, Esq. (Bar No. 82106)
1009 Russell Street
Covington, KY 41011-3052
(859) 781-4556 (p)
(859) 781-5523 (f)

Steve W. Berman (*pro hac vice pending*)
Ari Y. Brown (*pro hac vice pending*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 8th Avenue, Suite 3300
Seattle, WA 98101
(206) 623-7292 (p)
(206) 623-0594 (f)

Noah Axler (*pro hac vice pending*)
Michael D. Donovan (*pro hac vice pending*)
DONOVAN AXLER, LLC
1845 Walnut Street, Ste. 1100
Philadelphia, PA 19103
(215) 732-6067 (p)
(215) 732-8060 (f)

Charles L. Williams (*pro hac vice pending*)
WILLIAMS & SKILLING, P.C.
4801 Radford Avenue, Suite A
Richmond, Virginia 23230
(804) 447-0307, ext. 305 9 (p)
(804) 447-0367 (f)

*Attorneys for Kathy Little, Greg Walker, Debra Walker, Richard Evans, and Phillip and Faye Whitaker*